UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| GRATUITY SOLUTIONS, LLC, and GRATUITY, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 1:25-cv-10948-JEK ) |
| TOAST, INC., | ) ) |
| Defendant. | ) ) ) |

# MEMORANDUM AND ORDER
# ON DEFENDANT'S MOTION TO DISMISS

**KOBICK, J.**

Plaintiffs Gratuity Solutions, LLC, and Gratuity, LLC (collectively, "Gratuity"), filed this action against defendant Toast, Inc. for allegedly misappropriating its trade secrets in violation of federal and state law, engaging in a civil conspiracy to do so, and intentionally interfering with its contractual relations. Pending before the Court is Toast's motion to dismiss the complaint for failure to state a claim. For the reasons that follow, Toast's motion will be denied. Gratuity plausibly alleges that it possessed trade secrets, that it took reasonable steps to protect its trade secrets, and that Toast misappropriated those trade secrets. Gratuity also plausibly alleges that Toast conspired with its Customer Advisory Board members, who were also customers of Gratuity, to misappropriate Gratuity's trade secrets, and that Toast encouraged those board members to disclose Gratuity's trade secrets to Toast, in violation of their contractual obligations of confidentiality.

**BACKGROUND**

I. <u>Factual Background.</u>

The following facts, recounted based on the allegations in the second amended complaint and documents attached to or sufficiently referenced in that pleading, are assumed true for purposes of the motion to dismiss. *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 81 (1st Cir. 2025).

Gratuity is a limited liability company headquartered in Florida. ECF 50, ¶ 3. Toast is a corporation headquartered in Massachusetts. *Id.* ¶ 4. Gratuity and Toast both make software products that facilitate tipping in the restaurant industry. Gratuity owns U.S. Patent No. 9,741,050 (the "'050 patent"), which discloses "components of [a] gratuity management system." *Id.* ¶ 32. Gratuity's PayDayPortal system is its software product based on the invention claimed in that patent. *Id.* ¶ 26. The PayDayPortal system allegedly contains trade secrets regarding the details of how to configure the system's interface. *Id.* ¶ 34. The protected features "include customer-specific 'recipes' used depending on each customer's specific equipment, requirements, needs, and preferences." *Id.* ¶ 40 (emphasis omitted). Exhibit 29 of the complaint describes those features in more detail. *See id.* ¶ 42; ECF 51-1 (sealed). Access to these purported trade secrets on Gratuity's PayDayPortal system is restricted to customers who sign the company's joint user agreement, which contains a confidentiality provision prohibiting the disclosure of such secrets. ECF 50, ¶¶ 1, 45-46; *see* ECF 50-19, § 11.

Toast similarly offers restaurant management products and services. ECF 50, ¶ 4. In August 2016, Gratuity approached Toast to discuss a business partnership that would enable certain customers of Toast to use Gratuity's platform. *Id.* ¶ 17. That same month, the companies executed a non-disclosure agreement, which facilitated their sharing of some trade secrets and other

confidential information, but did not grant Toast access to Gratuity's PayDayPortal system. *Id.* ¶¶ 18, 26, 38; *see* ECF 50-23. Since 2016, Toast has identified Gratuity as an "Integration Partner" on its website. ECF 50, ¶ 19. A broker, acting on behalf of Gratuity, also asked Toast about acquiring Gratuity in late 2019. *Id.* ¶ 20. Toast expressed interest, and the parties entered into another non-disclosure agreement. *Id.*; *see* ECF 50-24. In January 2020, Toast told the broker that it was no longer interested in acquiring Gratuity. ECF 50, ¶ 21. Gratuity asked Toast again about a merger or acquisition in September 2021, but Toast did not respond. *Id.* ¶ 24.

Toast launched its own gratuity management software, called "Toast Tips Manager," in November 2021. *Id.* ¶ 25. In 2022, this software allegedly began providing "certain features resembling those only available to [Gratuity's] customers through its PayDayPortal system," even though Toast was not a customer of Gratuity and thus lacked access to that system. *Id.* ¶¶ 37-38. More recently, Gratuity alleges, Toast Tips Manager started "offering more feature sets that are nearly identical to those found in [Gratuity's] commercial product and only available through its confidential PayDayPortal system." *Id.* ¶ 39. Toast allegedly published Gratuity's trade secrets on Toast's website, including in videos that "provide the public with detailed 'how-to' instructions to design and implement a gratuity management system using [Gratuity's] confidential and proprietary trade secrets and know-how." *Id.* ¶¶ 41-42; *see* ECF 51-1.

Toast obtained Gratuity's trade secrets, the complaint alleges, through certain members of its Customer Advisory Board, who also are or were customers of Gratuity. ECF 50, ¶¶ 1, 6, 47. Those members "'provide Toast with valuable insights to help guide the future of Toast'" and offer "'insights and feedback that help inform [Toast's] product roadmap.'" *Id.* ¶ 5 (citation omitted). As Gratuity's customers as well, such board members—like Joy Zarembka, the Vice President of Planning and Innovation for the Busboys and Poets restaurant since 2014—gained access to

3

Gratuity's PayDayPortal system after they or their establishment signed its joint user agreement. *Id.* ¶¶ 6-7, 43-44, 47. According to the complaint, Toast "encouraged" and had "an understanding" with "certain members of its Customer Advisory Board," including Zarembka, "to access, obtain, improperly use, and now disseminate without authorization, [Gratuity's] valuable and confidential trade secrets." *Id.* ¶¶ 47, 65, 71.

## II.     Procedural History.

Gratuity filed a lawsuit in this Court in September 2022 (the "2022 Massachusetts action"), alleging that Toast had infringed the '050 patent and U.S. Patent No. 10,726,436 (the "'436 patent") and had breached the two non-disclosure agreements. ECF 1, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. Sept. 19, 2022). In June 2023, the Court granted Toast's motion to dismiss the claim alleging infringement of the '436 patent but denied the motion as to the claim alleging infringement of the '050 patent. ECF 48, at 11-20, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. June 7, 2023). Applying Massachusetts law, the Court likewise denied Toast's motion to dismiss Gratuity's breach of contract claim. *See id.* at 21-22. The 2022 Massachusetts action was stayed in April 2024 pending the Patent Trial and Appeal Board's ("PTAB") decision in its *inter partes* review of the '050 patent. ECF 109, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. April 24, 2024). One year later, the Court lifted the stay after the PTAB determined that the claims in the '050 patent were unpatentable. ECF 113 to 115, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. April 7, 2025).

Before the PTAB issued its decision, Gratuity filed this lawsuit in August 2024 in the United States District Court for the Middle District of Florida. ECF 1. It then filed an amended complaint that same month and a second amended complaint in September 2024. ECF 18, 50. The

4

operative complaint asserts four claims: misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count I), and the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001-.009 (Count II); civil conspiracy to misappropriate Gratuity's trade secrets (Count III); and intentional interference with contract (Count IV). ECF 50, ¶¶ 48-72. In October 2024, Toast moved to dismiss that complaint for improper claim splitting, for lack of personal jurisdiction, or for failure to state a claim. ECF 54, at 7-16, 19-25. Alternatively, Toast moved to transfer the case to this Court pursuant to the first-to-file rule. *Id.* at 16-19. "Under the first-to-file rule, 'where the overlap between two suits is nearly complete[,] the usual practice is for the court where the case was first filed to resolve the issues, and the other court to defer by either staying, transferring, or dismissing the action.'" *Jimenez v. Kohl's Dep't Stores, Inc.*, 480 F. Supp. 3d 305, 306 (D. Mass. 2020) (quoting *Thakkar v. United States*, 389 F. Supp. 3d 160, 170 (D. Mass. 2019)); *see also Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005).

The Florida Court granted Toast's motion to transfer the action in April 2025 without resolving the merits of the motion to dismiss. ECF 88. Applying the first-to-file rule, the Court reasoned that the 2022 Massachusetts action was filed first, the parties are the same in the two cases, and even though "the Massachusetts action alleges patent infringement while this action alleges misappropriation of trade secrets, both actions are about whether Toast unlawfully used Gratuity's propriety information to develop its Tips Manager." *Id.* at 4-5. Once the case arrived in the District of Massachusetts, Toast filed a new motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). ECF 105. Gratuity, for its part, filed a motion in the 2022 Massachusetts action to consolidate that case with this case. ECF 119, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. May 27, 2025). The Court held a hearing on both motions after they were

5

fully briefed. Toast represented at the hearing that, to the extent the Court were to deny in whole or in part its motion to dismiss in this case, it had no objection to consolidating the two lawsuits.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted).

## DISCUSSION

### I. Misappropriation of Trade Secrets Claims.

Gratuity claims that Toast misappropriated its trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001-.009. The DTSA provides a private right of action to "[a]n owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). The FUTSA similarly creates a cause of action for misappropriation of trade secrets. *See* Fla. Stat. §§ 688.003-.007. The parties agree that the elements of a claim under the DTSA and FUTSA are the same. *See Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1160 n.1 (11th Cir. 2024) (the DTSA "is so much like the [FUTSA]

that an analysis of a Florida claim amounts to an analysis of a federal one"); *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) (assuming that "the substantive standard for misappropriation is identical under FUTSA and DTSA"). To sustain its DTSA and FUTSA claims, Gratuity must plausibly allege that "(1) it possessed a trade secret and (2) the secret was misappropriated." *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1273 (11th Cir. 2021) (quotation marks omitted); *accord Analog Techs., Inc. v. Analog Devices, Inc.*, 105 F.4th 13, 17 (1st Cir. 2024) (DTSA); *Mapei Corp. v. J.M. Field Mktg., Inc.*, 295 So. 3d 1193, 1198 (Fla. 4th Dist. Ct. App. 2020) (FUTSA).[1]

    A.    <u>Trade Secrets.</u>

The DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). FUTSA's definition of a "trade secret," while not identical, is "substantially equivalent." *Compulife*, 959 F.3d at 1311 n.13; *see* Fla. Stat. § 688.002(4).

At this early juncture, Gratuity has adequately alleged "that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Am. Red*

---

[1] In general, "when one district court transfers a case to another, . . . the transferee court applies its own Circuit's cases on the meaning of federal law." *AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*, 921 F.3d 282, 288 (1st Cir. 2019). Here, however, since the First Circuit and Eleventh Circuit recognize the same elements for a DTSA claim, this Memorandum and Order relies primarily on Eleventh Circuit case law, which interprets both the DTSA and FUTSA.

*Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). According to the operative complaint, Toast gained access to "features implemented and configured through [Gratuity's] PayDayPortal system," including "the specific details of how to configure" the "interface" or "gratuity sync application" described in its '050 patent. ECF 50, ¶¶ 30, 34. The configurations of Gratuity's interface, including its "customer-specific 'recipes'" that depend "on each customer's specific equipment, requirements, needs, and preferences," are allegedly trade secrets. *Id.* ¶ 40 (emphasis omitted). Exhibit 29 to the complaint, in turn, identifies those features with more specificity. *See id.* ¶ 42; ECF 51-1 (sealed). These allegations, together with Exhibit 29, "'identify with reasonable particularity the trade secrets at issue.'" *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016) (per curiam) (quoting *AAR Mfg., Inc. v. Matrix Composites, Inc.*, 98 So.3d 186, 188 (Fla. 5th Dist. Ct. App. 2012)); *cf. Fin. Info. Techs.*, 21 F.4th at 1273 ("As a general matter, software source code is not readily ascertainable and, accordingly, qualifies for trade-secret protection."); *Poet Theatricals Marine, LLC v. Celebrity Cruises, Inc.*, 307 So. 3d 927, 929-30 (Fla. 3rd Dist. Ct. App. 2020) (reversing dismissal of FUTSA claim because plaintiff's trade secrets involving "a valuable proprietary training system and a digital tracking system used in aerial acrobatics entertainment aboard cruise ships, . . . protected through password-protection and confidentiality agreements," were described with sufficient detail).

Toast counters that Gratuity's alleged trade secrets are too broad or vague. But "[w]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'" *Compulife*, 959 F.3d at 1311 (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1298-99 (11th Cir. 2018)); *see Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So. 3d 550, 553 (Fla. 3rd Dist. Ct. App. 2020) ("Ordinarily, whether a particular type of information constitutes a trade secret is a question of fact." (quotation marks

omitted)). To allege the existence of a trade secret under the FUTSA or DTSA, "the plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret." *DynCorp*, 664 F. App'x at 848. Gratuity has cleared that bar, and it would be premature, at this stage, to delve into Toast's arguments about whether the aspects of the PayDayPortal system identified by Gratuity in Exhibit 29 are, in fact, trade secrets.

Trying another tack, Toast contends that most of the features identified in Exhibit 29 to the complaint were publicly disclosed in the '050 and '436 patents. While "the general rule is that the issuance of a patent destroys trade secret protection," those patents did not disclose all of Gratuity's alleged trade secrets, nor were the features that were disclosed in the '050 patent discussed with the same specificity as those identified in Exhibit 29. *Subscriber Holdings, LLC v. Brightstar Corp.*, No. 21-12985, 2022 WL 18034431, *4 (11th Cir. Dec. 23, 2022). Further, as the complaint alleges, the '050 patent could not have disclosed the trade secrets contained in Gratuity's PayDayPortal system because "[m]any of the features on [that] system were not even developed, let alone available," until after Gratuity applied for the '050 patent. ECF 50, ¶¶ 32-33; *see also Digiport*, 314 So. 3d at 553 ("'[E]ven if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret.'" (quoting *Capital Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998))).

Gratuity also allegedly takes reasonable steps to maintain the secrecy of its PayDayPortal system and obtains independent economic value from its trade secrets not being generally known. According to the complaint, Gratuity has protected its trade secrets by requiring a party to sign either a non-disclosure agreement or its joint user agreement, both of which contain confidentiality provisions prohibiting the disclosure of such secrets. ECF 50, ¶¶ 1, 6, 45-46. Gratuity further

9

safeguards its trade secrets by employing "user accounts and passwords, two-tier authentication, [and] encryption." *Id.* ¶ 50. Access to the trade secrets at issue here on Gratuity's PayDayPortal system is restricted to customers who sign its joint user agreement. *Id.* ¶ 37; *see* ECF 50-19, § 11.[2] And, as the complaint alleges, public access to these trade secrets damages Gratuity and its business operations. *See* ECF 50, ¶¶ 40, 42. At this stage in the proceedings, Gratuity's alleged efforts to preserve its trade secrets are sufficient to state a claim under the DTSA and FUTSA. *See Poet Theatricals*, 307 So. 3d at 929-30; *Delivery Kick Holdings, Inc. v. RJ Brookser LLC*, No. 24-cv-1506-KKM-NHA, 2025 WL 896330, at *2 (M.D. Fla. Mar. 24, 2025). Gratuity has, accordingly, plausibly alleged that it possessed trade secrets in connection with its PayDayPortal system.

    B.    <u>Misappropriation.</u>

The DTSA and FUTSA define "misappropriation," in relevant part, as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5); *accord* Fla. Stat. § 688.002(2). Both statutes define "improper means" to "includ[e] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); Fla. Stat. § 688.002(1). "One party can misappropriate another's trade secret by either acquisition, disclosure, or use." *Compulife*, 959 F.3d at 1311 (citing Fla. Stat. § 688.002(2)).

---

[2] Toast attaches what it claims to be the current terms and conditions for Gratuity's website and asserts that they do not contain a confidentiality provision. *See* ECF 106-1. Gratuity responds that those terms concern its general website, not its PayDayPortal. *See* ECF 117, at 11. The Court will not, at this stage in the case, address this apparent factual dispute between the parties.

The complaint plausibly alleges that, through members of Toast's Customer Advisory Board, all of whom were also customers of Gratuity, Toast gained access to Gratuity's trade secrets in the PayDayPortal system and is now using and disseminating those trade secrets without authorization. *See* ECF 50, ¶ 47. As alleged, Toast's Tips Manager began offering in 2022 "certain features resembling those only available to [Gratuity's] customers through its PayDayPortal system," even though Toast lacked access to that system. *Id.* ¶¶ 37-38. Toast also recently started "offering more feature sets that are nearly identical to those found in [Gratuity's] commercial product and only available through its confidential PayDayPortal system," and it has published information about those feature sets on its website. *Id.* ¶¶ 39, 41. Toast "would have not been able to offer the nearly identical features now available on its Toast Tips Manager product without misappropriating [Gratuity's] trade secrets" because "[h]ad Toast developed these features independently, it is unlikely that they would use nearly identical terminology, definitions, work-flows and ordering of configuration steps as found in Gratuity Solutions' PayDayPortal system." *Id.* ¶¶ 40, 53. Gratuity's complaint plausibly identifies the source of this alleged misappropriation as its customers who also are or were members of Toast's Customer Advisory Board. *Id.* ¶¶ 1, 6-7. As one example, after Busboys and Poets signed Gratuity's joint user agreement containing a confidentiality provision, Joy Zarembka, the restaurant's Vice President of Planning and Innovation, gained access to Gratuity's trade secrets and, in a video, allegedly "admitted [to] providing Toast with information to improve its products." *Id.* ¶¶ 9, 11.

Toast faults Gratuity for failing to allege that Zarembka ever actually accessed its PayDayPortal system, and it points out that, in the referenced video, Zarembka did not mention Gratuity or its tips management software. But taken as a whole and viewed in light most favorable to Gratuity, its allegations support the plausible inference that Toast employed improper means to

11

obtain and disclose Gratuity's trade secrets. *See Poet Theatricals*, 307 So. 3d at 930 (misappropriation adequately pled where defendant allegedly used "similar language [to the plaintiff's] to advertise to actors who [did] not need prior acrobatic experience" and established "its studio in a similar way to [the plaintiff's] training and rehearsal studio"); *Fin. Info. Techs.*, 21 F.4th at 1271 (evidence supported finding of misappropriation where defendant "began selling software similar to [plaintiff's] at a lower price"). Because Gratuity sufficiently states misappropriation claims under the DTSA and FUTSA, Toast's motion to dismiss those claims is denied.

## II. <u>Common Law Tort Claims.</u>

Gratuity also asserts claims of civil conspiracy to misappropriate its trade secrets and intentional interference with contractual relations. Toast contends that FUTSA preempts both claims and, in the alternative, that Gratuity fails to plausibly allege the essential elements of each claim. The parties dispute whether Gratuity's pendent tort claims are governed by Massachusetts law or Florida law, with Toast advocating the former and Gratuity the latter. Because the choice-of-law question bears on Toast's preemption defense, the Court must first determine the substantive law that governs Gratuity's claims.

### A. <u>Choice of Law.</u>

The parties dispute, as a threshold matter, whether Massachusetts or Florida law applies to Gratuity's common law tort claims. Generally, when a federal court exercises diversity jurisdiction, or supplemental jurisdiction over state-law claims in a federal question case, it must apply the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Felder v. Casey*, 487 U.S. 131, 151 (1988); *AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*, 921 F.3d 282, 289-90 & n.6 (1st Cir. 2019). But the Supreme Court has

long held that, when a case is transferred from one district court to another pursuant to the general transfer-of-venue statute, 28 U.S.C. § 1404(a), the transferee court must apply "the state law that the transferor court would have applied to any questions of state law." *AER Advisors*, 921 F.3d at 289 (emphases omitted) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 627 (1964), and *Ferens v. John Deere Co.*, 494 U.S. 516, 524-25 (1990)). Were it applicable here, that holding would require applying Florida's choice-of-law principles to determine whether Florida or Massachusetts law governs Gratuity's tort claims. Toast points out, however, that this case was not transferred as a matter of convenience to the parties and witnesses pursuant to Section 1404(a), but rather pursuant to the first-to-file rule. In Toast's view, the anti-forum shopping principles animating the Supreme Court's reasoning in the Section 1404(a) context carry less weight when cases are transferred pursuant to the first-to-file rule. In such transfers, Toast says, there is less risk of the defendant seeking the benefit of more favorable substantive law by way of a motion to transfer.

      Courts have divided on whether the case law governing Section 1404(a) transfers applies to first-to-file transfers. Some, like the Ninth Circuit, conclude that first-to-file transfers "implicate the same forum shopping concerns that underlie" the Supreme Court's holdings in *Van Dusen* and *Ferens* that a federal court exercising diversity jurisdiction must apply the transferor court's choice-of-law rules to determine which state's substantive law applies. *Commercial Money Ctr. v. Safeco Ins. Co. of Am.*, 605 F. App'x 609, 611 (9th Cir. 2015); *see also, e.g.*, *Falck USA, Inc. v. Scott Griffith Collaborative Sols., LLC*, No. 19-cv-08171-SBA, 2021 WL 1671972, at *4 (N.D. Cal. Mar. 31, 2021). The First Circuit, too, has applied the law of the transferor state in a first-to-file action where neither party contested its application. *See Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 34 n.23 (1st Cir. 2020). Other courts, like the Fourth Circuit, are skeptical that the Supreme Court's reasoning in the Section 1404(a) context, which turned in large part on that

statute's legislative history, carries over to first-to-file transfers. *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 600-01 (4th Cir. 2004); *see also, e.g.*, *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 525-26 (E.D. Pa. 2012); *David v. Signal Int'l, LLC*, No. 08-cv-1220, 2015 WL 3603944, at *1 (E.D. La. June 4, 2015).

The Court need not decide whether the Section 1404(a) case law controls this first-to-file case. That is so because Massachusetts and Florida both employ the same "most significant relationship" test to decide the substantive law that governs tort claims. Florida uses "a flexible test to determine which state has the most significant relationships to the" tort based on, as relevant here, the Restatement (Second) of Conflict of Laws § 145 (1971). *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006) (citing *Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980)). Massachusetts is similarly "guided" by "Section 145 of the Restatement" in assessing which state "has a more significant relationship to the parties and the" tort. *Cosme v. Whitin Mach. Works, Inc.*, 417 Mass. 643, 646-49 (1994). Under the "most significant relationship" test, the court considers "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2). The Court also weighs the seven factors listed in Section 6 of the Restatement. *See id.*; *Bishop*, 389 So.2d at 1001; *Cosme*, 417 Mass. at 647. Those factors are: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law,

14

(f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

The parties have offered no argument on the application of the factors outlined in Sections 6 and 145 of the Restatement. The Section 145 factors do not, however, appear to weigh strongly in favor of either Florida or Massachusetts law. Because Gratuity is a Florida-based limited liability company and Toast is a Massachusetts-based corporation, any injury to Gratuity likely occurred in Florida, but the conduct causing the alleged injury likely took place in Massachusetts. Gratuity represented to the Florida Court that "the damage occurred" in Florida, where its principals are based. ECF 79, at 27-28. But its complaint in the 2022 Massachusetts action acknowledged that "at least a portion of the [claimed patent] infringements alleged" occurred in Massachusetts. ECF 1, ¶ 11, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. Sep. 19, 2022). The operative complaint in this case, and the documents attached to that pleading, shed little light on the primary locus of the relationship between the parties. The complaint does not describe, for example, where the negotiations between the parties over the 2016 and 2019 non-disclosure agreements took place, nor does it contain allegations about the location of Toast's communications with the Customer Advisory Board members who may have disclosed Gratuity's trade secrets. Toast did, however, represent to the Florida Court that its Customer Advisory Board meets in person every year in Massachusetts, and that "the vast majority of all of [its] witnesses" and "all of the records are also located in Massachusetts." ECF 79, at 8, 12, 61.

While the first five Section 6 factors likewise appear to favor neither state's law over the other, the last two Section 6 factors—the certainty, predictability and uniformity of the result, and the ease in the determination and application of the law to be applied—convince the Court that Massachusetts law governs Gratuity's tort claims. Recall that in ruling on Toast's motion to

15

dismiss the 2022 Massachusetts action, this Court applied Massachusetts law to Gratuity's breach of contract claim. ECF 48, at 21-22, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. June 7, 2023). Several considerations supported that choice-of-law determination. First, the 2019 non-disclosure agreement contains a Massachusetts choice-of-law provision and has an integration clause stating that the contract "constitutes the entire agreement between the parties with respect to the subject matter contained herein and supersedes all prior agreements and discussions between the parties concerning such subject matter." ECF 50-24, §§ 11, 13. Second, both parties represented to the Court that Massachusetts law applies to Gratuity's breach of contract claim. *See* ECF 14, at 17, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. Nov. 4, 2022); ECF 31, at 18, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 22-cv-11539-JEK (D. Mass. Dec. 16, 2022). Also recall that Gratuity has filed a motion in that action seeking consolidation with this case, and Toast agrees that consolidation is warranted if this Court were to deny the pending motion to dismiss. The parties' positions on consolidation are sensible, and the two cases will be consolidated going forward. But it would make scant sense, as the consolidated case proceeds, to move forward with a breach of contract claim governed by Massachusetts law and tort claims governed by Florida law. Rather, it would best serve the goals of consistency, predictability, and uniformity to conclude that the parties' choice of Massachusetts law for the breach of contract claim should control all of Gratuity's common law claims—contract and tort alike—arising out of the parties' business relationship.

For these reasons, the Court concludes that Massachusetts has the most significant relationship to the conduct underlying Gratuity's tort claims. Gratuity's claims for civil conspiracy and intentional interference with contract are, accordingly, governed by Massachusetts law.

B.    The Merits.

Toast moves to dismiss Gratuity's tort claims on two bases: preemption under the FUTSA and failure to state a claim. The preemption provision of the FUTSA provides that the statute "displace[s] conflicting tort, restitutory, and other law *of this state* providing civil remedies for misappropriation of a trade secret," but "does not affect . . . [o]ther civil remedies that are not based upon misappropriation of a trade secret." Fla. Stat. § 688.008 (emphasis added). Under its plain text, the FUTSA preempts only certain causes of action under Florida law, not causes of action under the law of Massachusetts or any other state. Since Gratuity's tort claims arise under Massachusetts law, rather than Florida law, the FUTSA does not preempt either claim.

Toast next contends that Gratuity fails to sufficiently state claims for civil conspiracy to misappropriate its trade secrets and for intentional interference with contract. To prevail on its "'concerted action'" conspiracy claim, Gratuity must allege that Toast "either (1) acted 'in concert with or pursuant to a common design with' [certain members of its Customer Advisory Board] or (2) 'gave substantial assistance to' [their] conduct." *Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018) (quoting *Kyte v. Philip Morris Inc.*, 408 Mass. 162, 166-67 (1990)). Because this claim "is akin to a theory of common law joint liability in tort,'" *Greene v. Philip Morris USA Inc.*, 491 Mass. 866, 871 (2023) (quotation marks omitted), Gratuity must also allege "an underlying tort," *Snyder v. Collura*, 812 F.3d 46, 52 (1st Cir. 2016).

Gratuity has, as explained, adequately alleged an underlying tort—namely, that Toast misappropriated its trade secrets. The operative complaint also plausibly alleges that Toast (1) had "an understanding" with "certain members of its Customer Advisory Board," including Zarembka, "to misappropriate [Gratuity's] trade secrets"; and (2) "knew, should have known, or was willfully blind to" that misappropriation. ECF 50, ¶¶ 65-66. Toast argues that the complaint lacks factual

17

support for such an understanding. But that understanding can reasonably be inferred from Gratuity's additional allegations that the Customer Advisory Board "'provide[s] Toast with valuable insights to help guide the future of Toast'"; fifteen of its members, including Zarembka, "are, or were in the past, also customers of" Gratuity; and Zarembka "admitted [to] providing Toast with information to improve its products." *Id.* ¶¶ 5-6, 10-11 (citations omitted). These collective allegations are sufficient at this stage to sustain Gratuity's civil conspiracy claim. *See Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 221 (D. Mass. 2013) (denying motion to dismiss civil conspiracy claim where the plaintiff alleged that the defendants "conspired to misappropriate trade secrets" and "act[ed] in concert to commit the misappropriation"); *Hadley Pollett, LLC v. Yun Zhu*, No. 07-cv-1488, 2009 WL 5909268, at *3 (Mass. Super. Dec. 10, 2009) (same where the defendants allegedly "cooperated to misappropriate the plaintiffs' trade secrets and convert their property").

To state a claim for intentional interference with contract, Gratuity must plausibly allege that (1) it had contracts with certain members of Toast's Customer Advisory Board; (2) Toast "'knowingly induced'" those members to breach their contracts; (3) Toast's "'interference, in addition to being intentional, was improper in motive or means'"; and (4) it was harmed by Toast's actions. *Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 84 (2014) (quoting *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 715-16 (2011)). Gratuity adequately alleges each of these elements. According to the complaint, certain members of Toast's Customer Advisory Board, including Zarembka, were required to maintain the confidentiality of Gratuity's trade secrets pursuant to its joint user agreement. ECF 50, ¶¶ 40, 45, 50, 70-71. Toast "knew or should have known" about these members' contractual obligations of confidentiality, yet "encouraged" them to breach those duties without any justification. *Id.* ¶¶ 70-71. Consequently, Toast gained access to Gratuity's "highly

18

valuable" trade secrets from such members, who "provide 'insights and feedback that help inform [Toast's] product roadmap.'" *Id.* ¶¶ 10, 40 (citation omitted). And "Toast's interference . . . has damaged and continues to damage [Gratuity] in an amount to be determined at trial." *Id.* ¶ 72.

Toast retorts that the complaint fails to properly allege it knew that its Customer Advisory Board members were bound by Gratuity's joint user agreement. But Gratuity pleads more than just conclusory allegations of such knowledge. Based on its "business relationship" with Gratuity, Toast allegedly "was aware or should have been aware of the confidentiality restrictions [Gratuity] placed on access to and use of their trade secrets and other confidential information, both with respect to Toast and [Gratuity's] other customers." *Id.* ¶ 23. The complaint also identifies fifteen of Toast's Customer Advisory Board members, including Zarembka, who "are, or were in the past, also customers of" Gratuity. *Id.* ¶ 6. These factual allegations support the reasonable inference that "Toast knew or should have known that certain members of its Customer Advisory Board were under obligations and duties to protect [Gratuity's] trade secrets." *Id.* ¶ 70. Accordingly, the complaint sufficiently states a claim of intentional interference with contract under Massachusetts law.

## CONCLUSION AND ORDER

For the foregoing reasons, Toast's motion to dismiss, ECF 105, is DENIED.

SO ORDERED.

Dated: November 18, 2025

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE